**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Court File No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **MINNESOTA DEPARTMENT OF EDUCATION;** and **MINNESOTA STATE HIGH SCHOOL LEAGUE***,* | |
| Defendants. | |

The United States brings this civil action pursuant to Title IX, 20 U.S.C. § 1681 *et seq.*, for declaratory, injunctive, and damages relief. The United States alleges on information and belief as follows:

**INTRODUCTION**

1. The United States files this action to stop Minnesota's unapologetic sex discrimination against female student athletes. The State of Minnesota, through its Department of Education, and the Minnesota State High School League require girls to compete against boys in athletic competitions that are designated exclusively for girls and share intimate spaces, such as multi-person locker rooms and bathrooms, with boys. This unfair, intentionally discriminatory practice violates the very core of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

2. Title IX's core purpose is to ensure that both boys and girls have equal educational opportunities. This includes protecting girls' equal educational athletic

opportunities by recognizing that boys have an inherent biological advantage in sports. But Minnesota casts this aside in favor of so-called "gender identity," a choice that elevates ideology over biology, fairness, and safety.  In open defiance of Title IX's anti-discrimination protections, Minnesota's policies and practices create unfair competition, deny girls equal educational opportunities, and expose girls to a hostile educational environment with heightened risks of physical injury and psychological harm.

3.  The undeniable physiological differences between male and female athletes provide boys with inherent advantages in strength, speed, and physicality that pre-determine the outcome of athletic contests.  These differences are precisely why Title IX and its implementing regulations, *e.g.*, 34 C.F.R. Part 106 and 45 C.F.R. Part 86, permit and encourage sex-separated sports to ensure girls have an equal opportunity to participate in, excel at, and reap the educational benefits of athletics.  Yet Minnesota's policies and practices intentionally defy this core Title IX tenet by allowing some boys to compete in girls' sports without regard for these biological realities.

4.  Because Minnesota receives over three billion dollars in federal funding annually, Title IX requires Minnesota to provide equal opportunities for all students.  Yet Minnesota prioritizes gender ideology over biological reality, which means boys claim championships, break records, and invade spaces that rightfully belong to girls.

5.  Despite pleas from students and parents for fairness, safety, and sanity—and repeated warnings from federal officials that Minnesota is violating Title IX—Minnesota steadfastly and proudly persists in an intentionally discriminatory practice that harms vulnerable girls.

## NATURE OF THE ALLEGATIONS

6. The United States brings this action to enforce Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the implementing regulations of the United States Department of Education, 34 C.F.R. Part 106, and Department Health and Human Services, 45 C.F.R. Part 86.

7. Defendants' rules, policies, and actions are harming girls by denying girls the opportunity to compete in student sports on a level playing field in which they have the same opportunities as boys. Defendants unfairly force girls to compete against boys in competitions designated specifically for girls. These rules, policies, and actions intentionally discriminate on the basis of sex and harm female student athletes under Defendants' educational charge.

8. Not only do Defendants' policies and actions eviscerate equal athletic opportunities for girls, but they also require girls to share intimate spaces—such as locker rooms—with boys. Allowing boys to invade sensitive female-only spaces endangers girls' privacy, dignity, and safety—causing a hostile educational environment that denies girls educational opportunities.

9. Title IX's core purpose is to ensure that both boys and girls have equal educational opportunities. This includes ensuring both sexes have equal opportunity to participate in school athletic programs. *See, e.g.,* 34 C.F.R. § 106.41(c); 45 C.F.R. § 86.41(c).

10.   The inherent physiological differences between the two sexes make them generally dissimilarly situated in athletics.  These physiological differences exist regardless of how a person subjectively identifies regarding gender.

11.   Because of these physiological differences, providing athletic teams, competitions, and events for girls has long ensured that female student athletes are afforded an equal, and equally safe, opportunity to participate and effectively compete, thereby enjoying the same educational benefits from sports as compared to boys.

12.   Defendants recognize the inherent biological advantage of boys by intentionally separating athletics by sex.  But Defendants then ignore this biological advantage by providing an exception for trans-identifying boys.  This break from biology discriminates against girl athletes and violates Title IX's equal-opportunity mandate. Defendants have adopted and implemented rules, policies, and practices that force girls to compete against boys—despite the real physiological differences between the sexes—if a boy asserts that he is a girl.  And despite Title IX's mandate, Defendants have adopted and implemented policies and practices that allow boys to invade sensitive female-only spaces, endangering girls' privacy, dignity, and safety and causing a hostile educational environment that denies girls educational opportunities.

13.   The United States accordingly seeks a judgment granting declaratory, injunctive, and damages relief for Defendants' violations of Title IX and the federal funding contracts the Minnesota Department of Education entered into, wherein it promised to comply with Title IX and its implementing regulations.

**PARTIES**

14.  Plaintiff is the United States of America.

15.  Defendant MINNESOTA DEPARTMENT OF EDUCATION ("MDE") is a government agency of the State of Minnesota.  MDE acts as the primary state agency responsible for implementing and overseeing laws and policies governing public education, including scholastic athletics.  *See* Minn. Stat. § 120A.02.

16.  MDE exercises general supervision over public schools and public educational agencies.  Minn. Stat. § 127A.05.

17.  MDE also oversees and administers state and federal education funding.  *See* Minn. Stat. § 127A.09.

18.  Defendant MINNESOTA STATE HIGH SCHOOL LEAGUE ("MSHSL") is a nonprofit corporation organized under Minnesota State law.  Minn. Stat. § 128C.01.  MSHSL is also a political subdivision of the State of Minnesota and is considered a state agency for some purposes.  Minn. Stat. §§ 128C.15 & 128C.22.

19.  MSHSL consists of high schools who have delegated their control and responsibility for interscholastic athletics to MSHSL.  Minn. Stat. § 128C.01, subdiv. 1.

20.  MSHSL's purpose is to promote, manage, and administer athletics for the students of member schools.[1]

---

[1]  *About*, Minnesota State High School League, https://www.mshsl.org/about (last visited March 26, 2026)).

5

**JURISDICTION AND VENUE**

### A. GENERALLY

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 because this action arises under federal law and the United States is the Plaintiff.

22. Declaratory and injunctive relief is sought as authorized by 28 U.S.C. §§ 2201 and 2202.

23. Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391(b) because Defendants reside in Minnesota, and a substantial part of the events or omissions giving rise to this claim occurred in this judicial District of Minnesota.

24. The United States is authorized to initiate this action under 20 U.S.C. § 1682.

### B. TITLE IX JURISDICTION

25. The United States has satisfied all prerequisites to filing this lawsuit under 20 U.S.C. § 1682.

26. Defendant MDE is a current and past recipient of federal funding.

27. MDE distributes that federal funding to subrecipient public and private local schools. *See* Minn. Stat. § 127A.09. MDE must ensure that those subrecipient schools comply with Title IX. *See, e.g.*, Minn. R. § 3535.2800(B).

28. All MDE's operations constitute an educational program or activity within the meaning of Title IX.

29.  MDE currently receives from the United States Department of Education ("USDOE") approximately $2.98 billion in federal funding, of which approximately $679 million remains available for drawdown by MDE.

30.  As a condition to receiving federal funding, MDE entered into contractual assurance agreements with USDOE where MDE agreed to comply and ensure its subrecipients comply with Title IX and USDOE's regulations implementing Title IX. *See* 34 C.F.R. § 106.4(a) (requiring assurance); *see also* 34 C.F.R. § 75.700.

31.  MDE currently receives from the United States Department of Health and Human Services ("HHS") approximately $42.6 million in federal funding, of which approximately $24.6 million remains available for drawdown by MDE.

32.  As a condition to receiving federal funding, MDE entered into contractual assurance agreements with HHS where MDE agreed to comply and ensure its subrecipients comply with Title IX and HHS's regulations implementing Title IX.  *See* 45 C.F.R. § 86.4 (requiring assurance).

33.  MDE has entered into multiple contractual assurance agreements with USDOE and HHS after the President issued Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (February 11, 2025) ("Sports Executive Order").

34.  Defendant MSHSL receives federal funding through dues payments from its member schools, who are federal funding subrecipients.

35.  MSHSL is also subject to Title IX because state law grants authority over interscholastic athletics to MSHSL and MDE, and federal funding subrecipient local schools have also ceded their authority to MSHSL.

36.  On September 30, 2025, the USDOE and HHS notified Defendants that Defendants were not in compliance with Title IX and further advised Defendants of the actions necessary for Defendants to come into compliance.

37.  After multiple attempts to secure Defendants' voluntary compliance, USDOE and HHS determined that Defendants' compliance could not be secured by voluntary means.

38.  After determining voluntary compliance could not be secured, on January 26, 2026, the USDOE and HHS referred the matter to the United States Department of Justice for judicial enforcement.

39.  Minnesota has already conceded that the United States has "taken all the necessary steps to bring an enforcement action."  Minnesota Op. to Defs.' Mot. to Dismiss, *Minnesota v. Trump*, No. 25-cv-01608 (D. Minn. Feb. 26, 2026), ECF No. 66.

## FACTS

### C. TITLE IX REQUIREMENTS

#### 1.  The Title IX Statute

40.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.

41.  Title IX's use of the term "sex" means and has always meant biological sex, according to that term's plain biological and binary (*i.e.*, male or female) meaning.

42. Title IX's use of the term "sex" does not encompass or extend to gender identity.

43. Title IX carries the normal definition of "discrimination," which is treating individuals or groups that are similarly situated differently without sufficient justification.

44. Title IX thus prohibits practices that subject members of one sex to less favorable or worse treatment than similarly situated members of the other sex.

45. The biological differences between the sexes are sometimes relevant and make the sexes dissimilarly situated.

46. Because males have an inherent biological advantage over females in athletics, the two sexes are not similarly situated in athletics.

47. Separating sports by sex is not "discrimination" prohibited by Title IX because it treats similarly situated individuals equally by distinguishing the sexes based on relevant biological differences.

48. Because males and females are not similarly situated in athletics, separating sports by sex is not "discrimination" under Title IX when the separation does not treat either sex worse than the other.

49. Separating sports by sex is "discrimination" prohibited by Title IX when it causes harm or the separation treats either sex worse than the other.

50. For intimate spaces, such as multi-person locker rooms and bathrooms, the biological differences between males and females are relevant and make the sexes dissimilarly situated.

51.  Title IX recognizes that biological differences are relevant to intimate spaces, and the statute particularly recognizes that it is not discrimination to "maintain separate living facilities for the different sexes."  20 U.S.C. § 1686.

52.  Separating intimate spaces by sex is not "discrimination" prohibited by Title IX because it treats similarly situated individuals equally by distinguishing the sexes based on relevant biological differences.

53.  Separating intimate spaces by sex is "discrimination" prohibited by Title IX when it causes harm or the separation treats either sex worse than the other.

### 2.  The Title IX Regulations

54.  Because of relevant biological differences between the two sexes, the regulations implementing Title IX expressly contemplate sex-separated athletics.

55.  The regulations of the United States Department of Education implementing Title IX ("Implementing Regulations") are codified at 34 C.F.R. §§ 106.1-106.82.

56.   The regulations of the United States Department of Health and Human Services implementing Title IX are codified at 45 C.F.R. §§ 86.1-86.71.

57.  HHS's regulations implementing Title IX are substantially the same as USDOE's Implementing Regulations.  *Compare* 34 C.F.R. §§ 106.1-106.82, *with* 45 C.F.R. §§ 86.1-86.71.

58.  The Implementing Regulations provide that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or

other education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a); 45 C.F.R. § 86.31.

59. The Implementing Regulations' use of the term "sex" means and has always meant biological sex, according to that term's plain biological and binary (*i.e.*, male or female) meaning; the term "sex" does not encompass or extend to gender identity.

60. Consistent with "sex" meaning biological sex in Title IX, the President of the United States issued on January 20, 2025, Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, and issued on February 5, 2025, the Sports Executive Order, which both confirmed the definition of the term "sex" for Title IX:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

. . .

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

11

61.  The Implementing Regulations include a regulation particularly explaining Title IX's application to athletics ("Athletics Regulation").  34 C.F.R. § 106.41; *accord* 45 C.F.R. § 86.41.

62.  The Athletics Regulation first declares a general prohibition of the use of sex in athletics, providing that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis."  34 C.F.R. § 106.41(a); *accord* 45 C.F.R. § 86.41.

63.  The Athletics Regulation then provides a limited exception to that general prohibition by allowing some separation by sex, namely that "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  34 C.F.R. § 106.41(b); *accord* 45 C.F.R. § 86.41(b).

64.  Because such separation cannot disadvantage either sex, the Athletics Regulation requires that if an educational program separates teams by sex, the teams that the program designates as female teams must be completely separated by sex.  *See* 34 C.F.R. § 106.41(b); *accord* 45 C.F.R. § 86.41(b).

65.  The Athletics Regulation also provides that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c); *accord* 45 C.F.R. § 86.41(c).

66. The Athletic Regulation's requirement of "equal athletic opportunity for members of both sexes" recognizes that any sex-based separation cannot harm either sex or treat either sex worse.

67. The Implementing Regulations also expressly permit separating intimate spaces based on sex. The Regulations allow an education funding recipient to provide "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. *accord* 45 C.F.R. § 86.33.

### D. DEFENDANTS' DISCRIMINATION AGAINST GIRL STUDENT ATHLETES

68. MDE, Minnesota school districts, and MSHSL have for many years offered sex-separated athletics programs, with some teams specifically designated for only females.

69. Historically in Minnesota, females' overall educational athletic opportunities have previously been limited.

70. Historically in Minnesota, males' overall educational athletic opportunities have not previously been limited.

71. MDE, Minnesota school districts, and MSHSL recognize that males have an inherent biological advantage over females in athletics and have intentionally separated some athletics by sex because of that biological advantage.

72. Examples of sex-separated athletic programs that the MSHSL and its member schools offer to students in Minnesota include:

Badminton (Girls)
Basketball (Boys and Girls)
Cross Country (Boys and Girls)

13

Golf (Boys and Girls)
Gymnastics (Girls)
Hockey (Boys and Girls)
Lacrosse (Boys and Girls)
Alpine Skiing (Boys and Girls)
Soccer (Boys and Girls)
Softball (Girls)
Swimming & Diving (Boys and Girls)
Synchronized Swimming (Girls)
Tennis (Boys and Girls)
Track & Field (Boys and Girls)
Volleyball (Boys and Girls)
Wrestling (Boys and Girls)

MSHSL 2024-2025 Handbook, p 2.

### 1. Minnesota State Law

#### a. Minnesota State Law Authorizes Sex-Separated Athletics

73.  The Minnesota State Education Code specifically provides for the separation of school athletics by "sex" and for equal opportunities for members of "each sex." *See* Minn. Stat. § 121A.04.

74.  The Minnesota State Education Code authorizes intentionally separating school athletics by sex, not gender identity.  *See* Minn. Stat. § 121A.04.

75.  Under the section titled "Athletic programs; sex discrimination," the Education Code, Minn. Stat. § 121A.04, provides:

Subdivision 1. Purpose. The legislature recognizes certain past inequities in access to athletic programs and in the various degrees of athletic opportunity previously afforded members of each sex, race, and ethnicity. The purpose of this section is to provide an equal opportunity for members of each sex and members of all races and ethnicities to participate in athletic programs.

Subd. 2. Equal opportunity in athletic programs. Each educational institution or public service shall provide equal opportunity for members of each sex and members of all races and ethnicities to participate in its athletic program. In determining whether equal opportunity to participate in athletic programs

14

is available for the purposes of this section, at least the following factors shall be considered to the extent that they are applicable to a given situation: whether the opportunity for males and females to participate in the athletic program reflects the demonstrated interest in athletics of the males and females in the student body of the educational institution or the population served by the public service; whether the opportunity for members of all races and ethnicities to participate in the athletic program reflects the demonstrated interest in athletics of members of all races and ethnicities in the student body of the educational institution or the population served by the public service; whether the variety and selection of sports and levels of competition effectively accommodate the demonstrated interests of members of each sex; whether the variety and selection of sports and levels of competition effectively accommodate the demonstrated interests of members of all races and ethnicities; the provision of equipment and supplies; scheduling of games and practice times; assignment of coaches; provision of locker rooms; practice and competitive facilities; and the provision of necessary funds for teams of one sex.

Subd. 3. Exceptions. (a) Notwithstanding any other state law to the contrary, in athletic programs operated by educational institutions or public services and designed for participants 12 years old or older or in the 7th grade or above, it is not an unfair discriminatory practice to restrict membership on an athletic team to participants of one sex whose overall athletic opportunities have previously been limited.

(b) When an educational institution or a public service provides athletic teams for children 11 years old or younger or in the 6th grade or below, those teams shall be operated without restrictions on the basis of sex, except that when overall athletic opportunities for one sex have previously been limited and there is a demonstrated interest by members of that sex to participate on a team restricted to members of that sex, the educational institution or public service may provide a team restricted to members of that sex.

(c) When two teams in the same sport are in fact separated or substantially separated according to sex, the two teams shall be provided with substantially equal budgets per participant, exclusive of gate receipts and other revenues generated by that sport, and in all other respects shall be treated in a substantially equal manner. However, nothing in this section shall be construed to require the two teams to conduct combined practice sessions or any other combined activities related to athletics.

(d) If two teams are provided in the same sport, one of these teams may be restricted to members of a sex whose overall athletic opportunities have previously been limited, and members of either sex shall be permitted to try out for the other team.

15

(e) Notwithstanding the provisions of paragraphs (a), (b), and (d), any wrestling team may be restricted to members of one sex whether or not the overall athletic opportunities of that sex have previously been limited, provided that programs or events are provided for each sex to the extent the educational institution or public service determines that these programs or events are necessary to accommodate the demonstrated interest of each sex to participate in wrestling.

Subd. 4. Provision of separate teams. When an equal opportunity to participate in the elementary or secondary school level athletic program of an educational institution or public service is not provided to members of a sex whose overall athletic opportunities have previously been limited, that educational institution or public service shall, where there is demonstrated interest, provide separate teams for members of the excluded sex in sports which it determines will provide members of that excluded sex with an equal opportunity to participate in its athletic program and which will attempt to accommodate their demonstrated interests.

Minn. Stat. § 121A.04 (as last amended by 2023 Minn. Laws ch. 55, art. 12 (H.F. 2497)).

### b. Minnesota State Law Provides an Exception for Trans-Identifying Males

76. While the Minnesota Education Code authorizes intentionally separating athletics by sex and designating separate teams for males and females, state law separately provides an exception to this separation for trans-identifying males.

77. The Minnesota Human Rights Act ("MHRA") declares that it is an unfair discriminatory practice to discriminate in education because of "gender identity." *See* Minn. Stat. § 363A.02, subdiv. 1(a)(5); Minn. Stat. § 363A.13, subdiv. 1.

78. The MHRA provides an exception to separating athletics by sex; that exception allows trans-identifying males to participate in athletics intentionally designated for only females. *See* Minn. Stat. § 363A.02, subdiv. 1(a)(5); Minn. Stat. § 363A.13, subdiv. 1.

79. The MHRA defines "gender identity" as "a person's inherent sense of being a man, woman, both, or neither. A person's gender identity may or may not correspond to their assigned sex at birth or to their primary or secondary sex characteristics. A person's gender identity is not necessarily visible to others." Minn. Stat. § 363A.03, subdiv. 50.

80. For athletics and intimate spaces, the MHRA's exception for "gender identity" conflicts with Title IX's requirement to not discriminate on the basis of sex because it conflicts with and eliminates the biological basis that justifies intentionally separating athletics and intimate spaces by sex.

81. The MHRA's exception for "gender identity" discriminates on the basis of sex against female students in both its language and effect.

### 2. *Minnesota Department of Education*

82. MDE's rules and policies authorize schools to intentionally separate athletics based on sex but then provides an exception to this separation for trans-identifying males.

83. The Education Code specifically tasks MDE, through its commissioner, to promulgate rules to implement the statutory provision "Athletic programs; sex discrimination," Minn. Stat. § 121A.04, that authorizes sex-separated scholastic athletics.

84. MDE has promulgated rules to implement the intentional sex-separation of teams authorized by Minn. Stat. § 121A.04. Those MDE administrative rules for the "SEPARATION BY TEAMS" are found at Minn. R. 3535.3200.

85. MDE's separation-of-athletics rule authorizes educational athletics programs to intentionally separate athletics by sex, not gender identity. Minn. R. 3535.3200.

86.  Under the section titled "SEPARATION BY TEAMS," MDE's administrative rule provides:

Subpart 1. **Programs for students in the seventh grade and above.** Athletic programs for students in the seventh grade or above may include one or more teams limited to participants of one sex whose overall athletic opportunities have previously been limited.

Subp. 2. **Programs for students in the sixth grade and below.** Athletic programs for students in the sixth grade or below shall be operated without restrictions on the basis of sex, except that when overall athletic opportunities for one sex have previously been limited and there is demonstrated interest by members of that sex to participate on a team restricted to members of that sex, the educational institution may provide a team restricted to members of that sex. The educational institution shall make a biennial determination of students' demonstrated interest. The method used shall be reported to the Department of Education in conjunction with the report required by part 3535.3600.

Subp. 3. **Provision of separate teams.** Any public or private elementary or secondary school may provide in the same sport two teams which are separated according to sex when overall athletic opportunities for one sex have previously been limited, but the team for the other sex may only be substantially separated by sex.

When an equal opportunity to participate is not provided to members of a sex whose overall athletic opportunities to participate have previously been limited, the school, where there is a demonstrated interest, shall provide separate teams in sports which it determines will provide members of the excluded sex with an equal opportunity and which will attempt to accommodate their demonstrated interest.

Subp. 4. **Try outs for opposite team.** When overall athletic opportunities for one sex have previously been limited, members of that sex shall be permitted to try out and, if successful, to participate on any team in any sport. This part does not prohibit any elementary or secondary school from making participation on a team in a sport dependent upon a demonstrated level of skill and ability. When an educational institution has established a team exclusively for members of the sex whose overall athletic opportunities have previously been limited, members of the other sex may not try out for or participate on that team.

Minn. R. 3535.3200.

18

87. Because overall athletic opportunities have previously been limited for girls, but not boys, MDE's "SEPARATION BY TEAMS" administrative rule effectively provides that girls can try out for boys' teams, but that boys cannot try out for girls' teams. *See* Minn. R. 3535.3200, subpts. 3-4.

88. MDE's administrative rules also require schools to make a biennial determination and report to the MDE regarding student interest in "athletic activities to be provided in the athletic program for the purpose of providing separate teams or sports for members of [sic] previously excluded sex." Minn. R. 3535.3300.

89. That MDE administrative rule requires that schools "shall provide equal opportunity for members of each sex" by, among other things, considering the "number of opportunities for females to participate on teams is to be comparable to the number of opportunities for males to participate on teams." Minn. R. 3535.3300.

90. That MDE administrative rule also requires that the "equipment, supplies, and uniforms for each sport are to be comparable for *both sexes*," and that "locker rooms, practice, and competitive facilities are to be comparable for *both sexes*." Minn. R. 3535.3300 (emphasis added).

91. MDE's administrative rules also provide that when separating by sex in the same sport, the two teams should "be treated in a substantially equal manner" by providing comparable, for example, equipment, schedules, travel and per diem, coaching, locker rooms, practice, competitive facilities, and publicity. Minn. R. 3535.3400.

92. MDE's administrative rules for scholastic sports do not specifically use or reference the words "gender identity" or "transgender."

93. In 2017, MDE issued guidance for schools concerning athletics and intimate spaces in a document titled "A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students (Revised: September 25, 2017)" ("MDE Transgender Toolkit").[2]

94. The MDE Transgender Toolkit states that "[g]ender identity" and "assigned sex" are "separate identity characteristics."

95. The MDE Transgender Toolkit provides the following definitions for schools to observe:

- Gender identity – an individual's innate sense of one's own gender; a deeply held sense of psychological knowledge of one's own gender, regardless of the gender assigned at birth.

- Gender expression – the external appearance, characteristics or behaviors typically associated with a specific gender.

- Gender nonconforming – people whose gender expression differs from stereotypical expectations, such as "feminine" boys, "masculine" girls, and those who are perceived as androgynous or gender nonbinary.

- Sexual orientation – refers to the sex of those to whom one is sexually and romantically attracted. Categories of sexual orientation typically have included attraction to members of one's own sex (gay or lesbian), attraction to members of the other sex (heterosexual) and attraction to members of both sexes (bisexual).

- Transgender – an umbrella term for people whose gender identity, gender expression or behavior does not conform to that typically associated with the sex to which they were assigned at birth.

Transgender Toolkit at 1-2.

---

[2] MDE, *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* (Sept. 25, 2017), https://perma.cc/RK3E-HFTM.

96.  For athletics, the MDE Transgender Toolkit incorrectly states that "Title IX requires schools provide transgender students with the right to participate in such activities, including athletics, in a manner consistent with their gender identity."

97.  Also for athletics, the MDE Transgender Toolkit relays that MSHSL "allows participation for all students regardless of their gender identity or expression" and a "student or the student's family can make an appeal to" MSHSL if a "school does not allow a student to participate on the team consistent with their gender identity or gender expression."

98.  For intimate spaces, the MDE Transgender Toolkit incorrectly states that requiring a trans-identifying student to use the bathroom designated for the student's sex is "unlawful."

99.  For bathrooms, the Transgender Toolkit relays that "[t]ransgender and gender nonconforming students should be afforded the opportunity to use the restroom of their choice."

100.  For locker rooms, the Transgender Toolkit relays that trans-identifying students should be allowed to choose either sex-separated locker room.

101.  For shared hotel rooms separated by sex for athletic or other education-related travel, the Transgender Toolkit relays that trans-identifying students should be allowed to choose to room with either sex.

102.  For students who object to sharing intimate spaces with a trans-identifying student of the opposite sex, the Transgender Toolkit relays those objections "may be addressed by segregating the student raising the objection provided that the action of the

21

school officials does not result in stigmatizing the transgender and gender nonconforming student." For example, students objecting to sharing a bathroom with someone of the opposite sex "can be provided a private space such as a single-user restroom."

103. For athletics and intimate spaces, the Transgender Toolkit conflicts with Title IX's requirement to not discriminate on the basis of sex because it conflicts with and eliminates the biological basis that justifies intentionally separating athletics and intimate spaces by sex.

104. The Transgender Toolkit discriminates on the basis of sex against girl students in both its language and effect.

### 3. Minnesota State High School League

#### a. MSHSL's Control over Interscholastic Athletics

105. The Education Code specifically cedes much of the state's control over interscholastic athletics, including equal athletic opportunities, to Defendant MSHSL.

106. According to state law, MSHSL "is a nonprofit corporation that is a voluntary association of high schools." Minn. Stat. § 128C.01, subdiv. 1.

107. MSHSL currently has more than 500 member schools.

108. MSHSL's self-claimed purpose is to "provide, promote, manage and administer a program of activities for the students of member schools on subsection, section and state levels in athletics" and "establish uniform and equitable rules for students in extra-curricular activities."

109. According to state law, MSHSL is also a political subdivision of the state and is considered a state agency for the purposes of employment and required public meetings. *See* Minn. Stat. §§ 128C.15 & 128C.22.

110. State law mandates that MSHSL have a 22-member governing board, 4 of whom the Minnesota Governor appoints. Minn. Stat. § 128C.01, subdiv. 4.

111. State law authorizes high schools to delegate control of extracurricular activities, including athletics, to MSHSL. Minn. Stat. § 128C.01, subdiv. 1.

112. Schools delegating extracurricular athletics to MSHSL must file a certificate of delegation with the MDE. Minn. Stat. § 128C.01, subdiv. 1.

113. State law requires MSHSL's governing board to "establish and adopt policies" for MSHSL. Minn. Stat. §§ 128C.01, subdiv. 4 & 128C.02, subdiv. 1; *see also* 2025–2026 MSHSL Official Handbook § 211.01.

114. The MSHSL Representative Assembly is tasked with making and changing MSHSL Bylaws. Member school representatives primarily control that Assembly, and schools are integrally involved in formulating the rules that govern athletics within MSHSL. *See* 2025–2026 MSHSL Official Handbook § 210.00.

115. State law authorizes MSHSL member schools to "spend money for, and pay dues to," MSHSL. *See* Minn. Stat. 128C.01, subdiv. 2.

116. MSHSL member schools pay annual dues to MSHSL, which sets the amount each year. 2025–2026 MSHSL Official Handbook § 204.00–205.00.

117. MSHSL receives federal funding indirectly through dues payments from its members, who themselves receive federal funding.

118.  Although the Education Code specifically cedes much of the state's control over interscholastic athletics to MSHSL, state law tasks MDE with some responsibility and authority over MSHSL.

119. State law tasks MDE, through its commissioner, with authority to review MSHSL activities.  This includes reviewing complaints and lawsuits against MSHSL, "evaluation of any proposed changes in league policy," and, more generally, review of "any league activities or league-related issues when the commissioner believes this review is warranted."  Minn. Stat. § 128C.20, subdiv. 1.

120.  State law also specifically authorizes MDE, through its commissioner, to make recommendations to the legislature as to "whether any legislation is made necessary by league activities."  Minn. Stat. § 128C.20, subdiv. 2.

121.  MDE, through its commissioner, is also responsible for ensuring schools' compliance with Title IX.  *See* Minn. R. 3535.2800, 3535.3600, 3535.3700.

122.  MDE is authorized to conduct on-site reviews of schools to ensure compliance with Title IX.[3]

123.  The Implementing Regulations also provide that funding recipients must comply with the Implementing Regulations regardless of "any rule or regulation of any organization, club, athletic or other league, or association which would render . . . student ineligible to participate or limit the eligibility or participation of any . . . student, on the

---

[3]  *See* MDE, *Civil Rights Compliance*, https://education.mn.gov/MDE/dse/civil/ (last visited March 26, 2026).

basis of sex, in any education program or activity operated by a recipient and which receives Federal financial assistance." 34 C.F.R. § 106.6(c); *accord* 45 C.F.R. § 86.6.

### b.  MSHSL Provides Sex-Separated Athletics

124.  MSHSL intentionally separates athletics by sex, not gender identity.

125.  The MSHSL Handbook specifically recites the full text of the Education Code that authorizes sex-separated scholastic athletics, namely "Athletic programs; sex discrimination," Minn. Stat. § 121A.04. *See* MSHSL 2024-25 Handbook App'x at p. 126.

126.  The state statute authorizing sex-separated scholastic athletics also specifically mandates that MSHSL "shall provide rules and regulations and conduct its activities so as to permit its members to comply fully with" the statute.  Minn. Stat. § 121A.04.

127.  As noted above, MSHSL intentionally provides teams designated for only girls in many sports, including basketball, cross-country, softball, and track and field. *See* MSHSL 2024-2025 Handbook, p 2.

128.  MSHSL is also a member of the National Federation of State High School Associations ("NFHS") and abides by NFHS standards.  NFHS recognizes inherent physical differences between boys and girls by, among other things, using different standards and conditions in boys' and girls' athletic competitions.  For example, NFHS provides for different sizes of basketballs, shot puts, and discuses, and different hurdle heights in track to account for the physical differences between the sexes.

### c.  The MSHSL Exception for Trans-Identifying Males

25

129.  After intentionally separating athletics by sex, MSHSL has provided an exception that allows trans-identifying males to participate in athletics specifically designated for only female students.

130.  MSHSL first adopted the exception for trans-identifying males in December 2014.  This exception appeared in the MSHSL 2015-16 Handbook as Bylaw 300.00, under the subheading "Transgender Eligibility Appeal Procedures for a Male to Female (MTF) Student."  MSHSL 2015-16 Handbook Bylaw 300.00 (at p. 53).

131.  The MSHSL 2015-16 Handbook version of Bylaw 300.00 declared a general policy of allowing an exception for "gender identity or gender expression" but also required, among other things, that a student and parent submit a written affirmation that the student's "consistent gender identity or that the gender identity is sincerely held as part of the student's core identity" and a "written statement from an appropriate health-care professional" that "verifies the existence of the student's consistent and uniform gender-related identity or sincerely held gender-related identity."

132.  The MSHSL 2015-16 Handbook version of Bylaw 300.00, in relevant part, read:

> A. Introduction.   [The MSHSL] allows participation for all students regardless of their gender identity or expression in an environment free from discrimination with an equal opportunity for participation in athletics. . . .
>
> B. Transgender Eligibility Appeal Procedures. The application to appeal a transgender eligibility determination is limited to the following circumstances:
>
> > 1) The school must have been notified, in writing, by a student and the student's parent(s)/legal guardian(s) that the student has a consistent gender identity or that the gender identity is sincerely held as part of the student's

core identity and the gender identity is different from the student's gender identity assigned at birth and that the student wishes to participate in athletics in a manner consistent with the student's gender identity. The information in Section 2) ***must have been presented to the student's school*** prior to any determination relative to the appropriate gender team on which the student will participate.

2) The appeal must be submitted to the MSHSL Executive Director or Designee ***and must include***, but is not limited to, the following:

a) The student's current transcript, school registration and any additional relevant information.

b) The written statement from the student and the student's parent(s)/legal guardian(s) affirming the consistent gender- related identity and expression to which the student self-relates.

c) Statements from individuals such as, but not limited to parents, friends, and/or teachers, which affirm that the actions, attitudes, dress and manner demonstrate the student's consistent or sincerely held gender-related identification and expression.

d) A written statement from an appropriate health-care professional, acting within the scope of his/her licensure that verifies the existence of the student's consistent and uniform gender-related identity or sincerely held gender-related identity.

e) Any other evidence that the gender identity is sincerely held as part of the person's core identity as may be required by the school or the MSHSL office relative to the eligibility determination.

3)  When the MSHSL Executive Director or the Executive Director's Designee has received the required information from the student, the Executive Director or the Executive Director's designee shall contact an Independent Hearing Officer who will review the submitted information.

MSHSL 2015-16 Handbook Bylaw 300.00 (emphasis added).

133.  Pursuant to an MDE recommendation that MDE gave on December 17, 2015, MSHSL amended its Bylaw 300.00 concerning trans-identifying males on February 4, 2015.

27

134. The February 2015 MSHSL Bylaw 300.00 amendment changed the subheading from "Transgender Eligibility Appeal Procedures for a Male to Female (MTF) Student" to "Eligibility Appeal Procedures for a Transgender Student."

135. The MSHSL Bylaw 300.00 amendment also deleted many of the requirements that the trans-identifying student needed to submit first to the school and then on appeal; these dropped requirements include the student and parent written affirmation of the student's "consistent gender identity or that the gender identity is sincerely held as part of the student's core identity" and a "written statement from an appropriate health-care professional."

136. MSHSL has not substantively changed its Bylaw 300.00 concerning trans-identifying males since the 2015 amendment, and the amendment remains the same in the current MSHSL 2024-25 Handbook Bylaw 300.00 (at pp. 61-62).

137. The current MSHSL 2024-25 Handbook Bylaw 300.00, in relevant part, reads:

> A. Introduction: [The MSHSL] allows participation for all students consistent with their gender identity or expression in an environment free from discrimination with an equal opportunity for participation in athletics . . .
>
> B. Transgender Eligibility Appeal Procedures: The application to appeal a transgender eligibility determination is limited to the following circumstances:
>
>> 1) The school must have made a determination of ineligibility based on the student's gender identity after receiving information that the student has a consistent gender identity or that the gender identity is sincerely held as part of the student's core identity and the gender identity is different from the student's sex assigned at birth and that the student wishes to participate in athletics in a manner consistent with the student's gender identity.

2) The appeal must be submitted to the MSHSL Executive Director or Executive Director's Designee *and may include*, but is not limited to, the following:

a) The student's current transcript, school registration and any additional relevant information.

b) The written statement from the student and the student's parent(s)/legal guardian(s) affirming the consistent gender-related identity and expression to which the student self-relates.

c) Statements from individuals such as, but not limited to parents, friends, and/or teachers, which affirm that the actions, attitudes, dress and manner demonstrate the student's consistent or sincerely held gender-related identification and expression.

d) A written statement from an appropriate health-care professional, acting within the scope of his/her licensure that verifies the existence of the student's consistent and uniform gender-related identity or sincerely held gender-related identity.

e) Any other evidence that the gender identity is sincerely held as part of the person's core identity as may be required by the school or the MSHSL office relative to the eligibility determination.

3) When the MSHSL Executive Director or the Executive Director's Designee has received the appeal from the student, the Executive Director or the Executive Director's Designee shall contact an Independent Hearing Officer who will review the submitted information.

. . .

Amended on February 4, 2016 as recommended by the MN Department of Education; Division of Compliance and Assistance on December 17, 2015.

MSHSL 2024-25 Handbook Bylaw 300.00 (emphasis added).

138. The current MSHSL Handbook Bylaw 300.00 states nothing about how a school is to make the initial determination of eligibility or ineligibility to participate according to gender identity.

139.  The current MSHSL Handbook Bylaw 300.00 does not provide for an appeal of, or any way to challenge, a school's determination that a trans-identifying male is eligible to participate in athletics designated for females.

140.  The MSHSL Handbook Bylaw 300.00 conflicts with Title IX's requirement to not discriminate on the basis of sex because it conflicts with and eliminates the biological basis that justifies intentionally separating athletics by sex.

141.  The MSHSL Handbook Bylaw 300.00 discriminates on the basis of sex against girl students in both its language and effect.

### 4.  *Defendants' Discriminatory Rules, Policies, and Practices Deny Equal Benefits and Opportunities to Girl Athletes*

142.  Defendants, and MSHSL member schools, are adhering to Defendants' rules, policies, and guidance that allows trans-identifying males to compete in athletics designated for only female students.  Defendant MDE and MSHSL member schools are adhering to Defendant MDE's rules, policies, and guidance regarding intimate spaces. This adherence denies female athletes equal educational benefits and opportunities based on their sex.

143.  Defendants' rules, policies, and guidance cause disparities of a substantial and unjustified nature in the benefits, treatment, services, and opportunities afforded to female athletes.

144.  Because of male athletes' biological athletic advantage, which is not affected by how the male athlete "identifies," Defendants' rules, policies, and guidance do not

cause a meaningful impact on the benefits, treatment, services, and opportunities afforded to male athletes.

145.  Male students have competed in the recent past and are currently competing against female students in interscholastic sports designated for female athletes in Minnesota.

146.  For example, Student A is a male student competing on the Champlin Park High School girls' varsity fastpitch softball team in the Anoka-Hennepin School District.

147.  Student A has competed against female athletes in the MSHSL Class AAAA Girls' Softball league since at least 2023 and still does so.

148.  The Champlin Park High School varsity fastpitch softball team is recognized as an MSHSL-sanctioned athletic program designated for girls.  Class AAAA includes the largest schools in Minnesota, whereas Class A represents the smallest schools in Minnesota.

149.  MSHSL has designated fastpitch softball as a girls' athletics program. MSHSL offers multiple athletic programs available for boys, including baseball.

150.  During the 2023 MSHSL Class AAAA softball season, Student A appeared in 13 games as a pitcher against all-girl teams, to help his girls' team to a 16-8 record on the season.

151.  Over the course of the 2023 season, Student A pitched 62 2/3 innings, with a 1.79 earned run average and 53 strikeouts.  This included five complete games pitched.

152.  Student A also appeared in seven games as a batter during the regular season and postseason, with a batting average of .312 and three runs batted in.

31

153. During the 2024 MSHSL Class AAAA softball season, Student A appeared in 19 games as a pitcher against all-girls teams; he led his girls' team to a 21-4 record on the season.

154. Over the course of the 2024 season, Student A pitched 105 1/3 innings, with a 0.40 earned run average and 106 strike outs. This included six complete-game shutouts and three games with double-digit strikeouts.

155. Student A also appeared in 24 games as a batter during the 2024 regular season and postseason, with a batting average of .397, including 5 extra-base hits and 16 runs batted in.

156. Student A's performance during the 2024 softball season was a record-setting season, placing him in the top 15 for all statistical categories kept in the Champlin Park Rebels Fastpitch Record Book (Season Records – Individual Pitching), including the top spot for Earned Run Average and tied for first for On-Base Ratio.

157. Additionally, Student A's career marks after the 2024 softball season placed him in the top 15 for all statistical categories kept in the Champlin Park Rebels Fastpitch Record Book (Career Records – Individual Pitching), including the top spots for both Earned Run Average and Winning Percentage.

158. During the 2025 MSHSL Class AAAA softball regular season, Student A started a total of 14 games as pitcher against all-girl teams. He obtained a personal 12-1 record, which led his girls' team to a 21-2 record on the season.

159. Student A threw a complete game each time he pitched, recording 94 innings pitched with a 0.74 earned run average, including 105 strikeouts.

160. At the end of the 2025 MSHSL Class AAAA softball season, Student A pitched in five consecutive games, three of which were part of the championship tournament.

161. In those 5 games, Student A allowed only 1 earned run in 35 total innings and struck out 27 batters.

162. Student A was the starting pitcher for all three games in the championship tournament, competing against all-girl teams.

163. During the championship tournament, Student A threw 3 complete games, recorded 2 shutouts, and struck out 13 batters.

164. Student A also batted in each of the three games of the championship tournament, with an average of .300, 2 extra-base hits, and 1 run batted in.

165. In the championship game, Student A pitched a complete-game shutout, allowing only 3 hits with 6 strikeouts in a 6-0 victory against the all-girl opposing team.

166. Student A's performance against the all-girl teams resulted in postseason honors, including his selection to the 2025 MSHSL Class AAAA Softball All-Tournament Team.

167. MSHSL published a news release on the MSHSL website, promoting Student A's dominant performance and stating, in part: "In three state tournament games, the Rebels (24-2) outscored the opposition, 14-2, including shutouts in the quarterfinals and championship game. . . . Champlin Park's crowning victory came behind . . . another impressive pitching performance by junior [Student A] . . . who gave up just three hits while striking out six."

33

168. Additionally, Student A's career marks after the 2025 softball season placed him in the top 10 for all statistical categories kept in the Champlin Park Rebels Fastpitch Record Book (Career Records – Individual Pitching), including the top spots for Earned Run Average, Strikeouts, Shut Outs, and Winning Percentage.

169. Student A intends to keep competing in girls' softball.

170. Student A's participation in sports designated for girls has displaced and will continue to displace girls and harm girls' equal educational athletic opportunities.

171. In another example, Student B is a male student competing on his school's girls' track and field team and girls' cross country running team in a school district in southeast Minnesota.

172. Girls' track and field and girls' cross country running are recognized as MSHSL-sanctioned athletic programs designated for girls. MSHSL offers multiple athletic programs available for boys, including boys' track and field and boys' cross country running.

173. During the 2024-25 school year, Student B competed in multiple races in the MSHSL girls' track and field season (Fall) and in multiple races in the MSHSL girls' cross country running season (Spring).

174. During the 2025-26 school year, Student B competed in multiple races in the MSHSL girls' track and field season (Fall) and plans to compete in multiple races in the MSHSL girls' cross country running season (Spring).

175. Student B's participation in sports designated for girls has displaced and will continue to displace girls and harm girls' equal educational athletic opportunities.

34

176. Beyond Students A and B, other boys have competed in, and will continue to compete in, athletic sports and competitions designated for girls, and have displaced, and will continue to displace, girl students and harm their equal educational athletic opportunities due to due to Defendants' discriminatory rules, policies, and guidance.

177. For intimate spaces, Defendant MDE's rules, policies, and guidance allowing trans-identifying students in intimate spaces designated for the opposite sex endanger students' safety, privacy, and dignity. MDE's rules, policies, and guidance regarding intimate spaces deny students equal access to educational benefits and opportunities based on their sex.

178. Defendant MDE's rules, policies, and guidance allowing trans-identifying students in intimate spaces designated for the opposite sex knowingly subject students to a hostile educational environment and sexual harassment that is so severe, pervasive, and objectively offensive that it deprives students of equal access to educational opportunities.

179. For example, in 2024, Student C, a 16-year-old female student at Stewartville High School, was forced to share school restroom and locker room facilities with boys. When Student C raised the issue with her school principal, the principal responded that the boys could "be whoever they want to be."

180. The hostile educational environment fostered by Defendant MDE's policies rules, policies, and guidance allowing trans-identifying students in intimate spaces designated for the opposite sex is so severe, pervasive, and objectively offensive that students have switched schools to avoid sharing intimate spaces with the opposite sex.

35

181.  Defendant MDE is aware that male students have invaded and are currently invading intimate spaces designated for only female students.

182.  Students have an interest in sex-separated intimate spaces, and students and parents have expressed this interest to Defendant MDE and to its federal funding subrecipient schools.  Defendant MDE and subrecipient schools have ignored those expressed interests.

183.  Defendants are also well aware that male students are competing in sports designated for female students.

184.  Female students have an interest in maintaining sex-separated athletics and sports designated for only females that effectively accommodate their interests and abilities.  Female students have expressed this interest to Defendants and federal funding subrecipient schools.  Defendants and subrecipient schools have ignored those expressed interests.

185.  Defendants' rules, policies, and guidance decrease the quality of female student athletes' competitive opportunities.

186.  Defendants' rules, policies, and guidance deny girls the equal athletic opportunity to qualify for, to compete and advance in, and to win or place higher in postseason competitions.

187.  Because of males' inherent biological advantage over females in athletics, Defendants' rules, policies, and guidance make it impossible for girls' educational athletic interests and abilities to be fully and effectively accommodated.

188.  Defendants' rules, policies, and guidance deny girls the equal athletic benefit of public visibility, recognition of athletic competition accomplishment, and increased opportunity for college athletic recruiting and scholarships.

189.  Defendants' rules, policies, and guidance cause girl students to have materially fewer athletic opportunities than they previously enjoyed because they no longer can compete in fair competitions that are exclusively for girls.

### 5.  *Defendants' Steadfast Refusal to Comply with Title IX Despite Warnings from Federal Officials*

190.  Defendants have intentionally and steadfastly refused to comply with Title IX despite multiple warnings from federal officials.

191.  On February 5, 2025, the President issued the Sports Executive Order that reaffirmed Title IX's use of the term "sex" means biological sex and not gender identity, and that under Title IX "educational institutions receiving Federal funds cannot deny women an equal opportunity to participate in sports."  Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (February 11, 2025).

192.  The day after the President issued the Sports Executive Order, MSHSL stood by its Bylaw that allows trans-identifying males to play in athletics designated for females.  *See* 1st Amend. Compl. ¶ 54, *Minnesota v Trump*, No. 25-cv-01608-ECT-DLM, (D. Minn. Dec. 12, 2025).

193.  On February 12, 2025, the USDOE announced its investigation of MSHSL for potential violations of Title IX.

194.   After the USDOE notice, on February 14, 2025, MSHSL sought a Minnesota Attorney General opinion on whether the Sports Executive Order preempts the MHRA, Minn. Stat. § 363A.01 *et seq*.

195.   On February 19, 2025, MDE issued a "Reminder about Student Civil Rights" that reminded local school officials about the MDE Transgender Toolkit for transgender and gender nonconforming students.

196.   On February 20, 2025, the Minnesota Attorney General issued an opinion that the Sports Executive Order does not have the force of law and therefore does not preempt the MHRA.  The opinion found complying with the Sports Executive Order "and prohibiting students from participation in extracurricular activities consistent with their gender identity would violate the MHRA."  The opinion did not opine on or consider whether the MHRA conflicts with Title IX.

197.   On February 25, 2025, United States Attorney General Pam Bondi sent the Minnesota Attorney General and MSHSL a letter providing notice that the DOJ intended to hold states that violate federal law accountable ("Bondi Letter").  The Bondi Letter referenced the Minnesota Attorney General's opinion and relayed that "[r]equiring girls to compete against boys in sports and athletic events violates Title IX."  The Bondi Letter reiterated that USDOE "has begun a Title IX investigation into the" MSHSL, and if that "investigation shows that relevant Minnesota entities are indeed denying girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys, the Department of Justice stands ready to take all appropriate action to enforce federal law."

198.  The United States did not receive any substantive response to the Bondi Letter.

199.  On April 8, 2025, United States Assistant Attorney General for Civil Rights Harmeet Dhillon sent the Minnesota Attorney General a notice letter ("Dhillon Letter"). The Dhillon Letter provided notice that the DOJ was "commencing a compliance review" pursuant to Title IX and requested a clarification of the Minnesota Attorney General's opinion.  The Dhillon Letter noted that the DOJ remained "gravely concerned with [the] opinion," but that the opinion "did not expressly mention Title IX."  The notice specifically asked that the Minnesota Attorney General "clarify that [the] opinion does not require Minnesota schools to require men and boys to compete in women and girls' sports."  The Dhillon Letter noted that a failure to respond by April 15, 2025, would be taken as a confirmation, which would "leave the Department with no choice but to seek judicial resolution."

200.  The Minnesota Attorney General requested an extension to April 22, 2025, to respond to the Dhillon Letter, which the DOJ granted.

201.  Rather than respond to the Dhillon Letter and comply with the compliance review, Minnesota used the extension to draft and file a preemptive and premature lawsuit against the President and DOJ on April 22, 2025, despite the DOJ's ongoing Title IX compliance review.  Compl., *Minnesota v. Trump*, No. 25-cv-01608-ECT-DLM, (D. Minn. April 22, 2025), ECF No. 1.

202.  Minnesota's lawsuit asserts that Minnesota law and policy require schools to allow trans-identifying males to play on sports teams that are designated for female

students.  Compl. ¶¶ 14-22, *Minnesota v. Trump*; *accord* 1st Am. Compl. ¶¶ 18-27, *Minnesota v. Trump*, ECF No. 53.

203.  Minnesota's lawsuit also incorrectly asserts that Title IX covers discrimination against individuals because of their gender identity.  *E.g.*, Compl. ¶ 87, *Minnesota v. Trump*; *accord* 1st Am. Compl. ¶ 107, *Minnesota v. Trump*.

204.  On April 25, 2025, MDE entered into a USDOE grant certification applicable to all its federal funding where MDE certified that it would comply with Title IX, Title IX regulations, and executive orders.

205.  That April 25, 2025, MDE grant certification to USDOE more particularly reads that MDE:

> Will comply with all applicable requirements of all other Federal *laws*, *executive orders*, *regulations*, and public policies governing financial assistance awards and any Federal financial assistance project covered by this certification document, including but not limited to: . . . *Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq.* . . .

Minnesota Department of Education Grants Certifications Report, SAM.gov (April 25, 2025) (emphasis added).

206.  On June 3, 2025, USDOE notified MDE that USDOE had initiated a Title IX investigation into MDE.

207.  Following Minnesota suing the DOJ in response to the DOJ's notice of compliance review seeking information, MDE did not offer to comply with the USDOE investigation or substantively respond to the notice.  Comparatively, MSHSL provided USDOE information during the investigation.

208. On June 26, 2025, HHS notified MDE and MSHLS that HHS had initiated a Title IX compliance review investigation into Defendants.

209. Following Minnesota suing the DOJ in response to the DOJ's notice of compliance review seeking information, MDE did not offer to comply with the HHS review or substantively respond to the notice.

210. On September 30, 2025, USDOE and HHS notified Defendants of their initial findings of noncompliance with Title IX. This notice of findings included a proposed voluntary resolution agreement.

211. Rather than substantively respond to the initial notice of findings by USDOE and HHS, Minnesota instead sued again by amending its complaint against the DOJ to add USDOE and HHS. *See* 1st Amend. Compl., *Minnesota v. Trump*, (D. Minn. Dec. 12, 2025), ECF No. 53.

212. On December 15, 2025, after USDOE and HHS made multiple attempts to reach a voluntary resolution agreement, MDE eventually affirmatively responded that it would not accept the proposed resolution agreement or engage in negotiations and pointed to Minnesota adding USDOE and HHS to its lawsuit.

213. On December 23, 2025, after USDOE and HHS made multiple attempts to reach a voluntary resolution agreement, the MSHSL eventually affirmatively responded that it would not accept the proposed resolution and pointed to the Minnesota lawsuit and other litigation.

## CLAIMS

### COUNT I
### VIOLATION OF TITLE IX

214.  The United States realleges and incorporates by reference the allegations set forth in all the above paragraphs numbered 1-213.

215.  Defendants are subject to and must comply with Title IX and the Implementing Regulations.

216.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.

217.  Based on all the foregoing, Defendants have violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* and the Implementing Regulations.

218.  Defendants' Title IX violations harm, and continue to harm, student athletes.

219.  Unless restrained by this Court, Defendants will continue to violate Title IX.

### COUNT II
### VIOLATION OF TITLE IX CONTRACTUAL ASSURANCES

220.  The United States realleges and incorporates by reference the allegations set forth in all the above paragraphs numbered 1-219.

221.  Defendant MDE has expressly agreed to comply with Title IX and the Implementing Regulations, and to ensure all parties with whom it arranges to provide

services or benefits also comply, as a condition of receiving federal financial assistance by entering into contractual assurance agreements with the United States.

222.  Defendant MDE's Title IX violations are material breaches of its contractual assurance agreements.

223.  The United States has suffered damages from Defendant MDE's breach of its contractual assurance agreements.

224.  Unless restrained by this Court, Defendant MDE will continue to materially breach its contractual assurance agreements with the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court grant the following relief:

(a) A declaratory judgment that Defendants' rules, policies, practices, and actions violate Title IX and Defendant MDE's Title IX contractual assurances;

(b) A permanent injunction prohibiting Defendants, and Defendants' officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Defendants, from further violating Title IX and Defendant MDE's Title IX contractual assurances;

(c) A permanent injunction ordering Defendants to:

    (1) stop allowing males to compete in athletic competitions designated for females;

    (2) issue a directive to all Minnesota federal funding subrecipient schools that prohibits the participation of males in athletic competitions designated for females;

    (3) maintain sex-separated intimate spaces and not allow exceptions for the opposite sex;

    (4) issue a directive to all Minnesota federal funding subrecipient schools to maintain sex-separated intimate spaces and not allow exceptions for the opposite sex;

    (5)  amend their discriminatory rules, policies, and guidance to comply with Title IX;

    (6) implement a monitoring and enforcement system to ensure compliance with Title IX's requirement of equal athletic opportunity;

    (7) establish a process to compensate female athletes who have been denied equal athletic opportunities due to Defendants' violations, including correcting past athletics records; and

    (8) submit regular compliance reports to the Court and the United States for a period of no less than five years;

(d) A damages award to the United States;

(e) An award of any applicable costs and fees; and

(f) An award of all such other additional relief as the interests of justice may require.

**JURY DEMAND**

The United States requests trial by jury on all eligible claims.

DATED:  March 30, 2026                    Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

JEFFREY MORRISON
Deputy Assistant Attorney General

 */s/ Jordan K. Carpenter*
JORDAN K. CARPENTER (035074TN)
Counsel

Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 514-3847
Email: jordan.carpenter2@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA